UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:19-cr-538-T-02SPF

DIDIER MANUEL GOMEZ ZUNIGA,

    Defendant.
_____/

### DEFENDANT DIDIER MANUEL GOMEZ ZUNIGA'S SENTENCING MEMORANDUM

Comes Now, the Defendant, DIDIER MANUEL GOMEZ ZUNIGA, by and through undersigned counsel, and hereby files this Sentencing Memorandum in advance of the sentencing proceeding scheduled for August 27, 2020. Mr. Gomez Zuniga entered a plea of guilty to Count One of the Indictment charging him with conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70506 (a) and (b) and 21 U.S.C. § 960(b)(1)(B)(ii). (doc. 49). For the reasons set forth below, Mr. Gomez Zuniga prays the Court show leniency and sentence him to 33 months imprisonment.[1]

**I.    BACKGROUND**

Mr. Gomez Zuniga is from a rural area of eastern Colombia near the Venezuelan border. He is a member of an indigenous Colombian tribe and lives in a region that is akin to a Native American reservation in the United States. While like a reservation, it lacks much of the

---

[1] This sentence represents the low end of an offense level 20 which would be the Defendant's offense level if the Court granted the Defendant's requests for a minor role departure and a three level departure for substantial assistance. If the Court does not grant these departures, the Defendant requests a corresponding variance based on the mitigating reasons set forth in this memorandum.

1

government support and programs found in the United States. He has lived on the reservation all his life, separate in many ways from Colombian society, and in a community that is extremely impoverished but close knit. His wife is also of indigenous descent, although her tribe is from areas that include parts of present-day Venezuela.

Mr. Gomez Zuniga had an unusual upbringing. His father had twenty-four children with five different women. Five of those children belong to Mr. Gomez Zuniga's mother, and he has nineteen half siblings. He also has two maternal half siblings. Not surprising given his father's lifestyle, Mr. Gomez Zuniga did not have a relationship with his father. His father was a driver and mechanic, but with so many dependents, he provided little, if any, support to Mr. Gomez Zuniga's mother and his children. Mr. Gomez Zuniga's mother suffers from high blood pressure and asthma, and, in their economically depressed region, was unemployed.

With his father's distractions and his mother's inability to work, his childhood was hopelessly impoverished. The family initially relied on Mr. Gomez Zuniga's oldest brother for support. His brother joined the Colombian Army, however, he was shot in the head when his gun accidentally discharged during a cleaning, and he suffered from mental impairment thereafter. After the accident, he became prone to wander. One day he wandered off and never came back.

When Mr. Gomez Zuniga was eight years old, his mother moved the family closer to the water so Mr. Gomez Zuniga could fish and earn a living. One can imagine that a family who relied on an eight-year-old to earn a living to support the family often went without food and other basic necessities. In order to work full time, Mr. Gomez Zuniga had to leave school in the second grade. As a result, he can barely read, but has some ability to write.

Mr. Gomez Zuniga's home is situated on the bank of a river. The location is beneficial for fishing and so the family has access to water because there is no public water or sewer where he

lives.  However, when the area experiences heavy rain, his house floods.  The area is currently experiencing a drought and the river is dry, which is helpful in preventing floods, but the trade-off is that his wife must travel to obtain water.

Mr. Gomez Zuniga continued to work as a fisherman for the next thirty-one years until an unfortunate circumstance struck.  Mr. Gomez Zuniga's daughter attended a local school supported by the Catholic diocese.  He received a second notice from her school informing him that his daughter needed a school uniform and her shoes were too worn to be acceptable at the school.  A third a notice would mean that his daughter would no longer be able to attend school.  Sadly, his level of poverty is such that he simply cannot afford uniforms and shoes for his children.  While Mr. Gomez Zuniga had struggled his entire life in poverty, and he made do with it, this particular problem devastated him at his core.  As a child, he did not have the opportunity for an education because he had to go to work when he was eight.  And, while that was necessary for the survival of his family, that lack of schooling did not lead to the life he hoped for his children.  He wanted his children to have opportunities he did not, and that notice from the school smacked him with the reality that poverty would rip that hope from him.

Mr. Gomez Zuniga had a friend who knew about his predicament and was planning to be a crew member on a go-fast smuggling trip.  Trying to help Mr. Gomez Zuniga, the friend asked the organizer of the trip if Mr. Gomez Zuniga could come along to earn money to buy the school uniform and shoes.  That is why there were four crew members on this boat instead of three.

His arrest in this case has been devastating for his family.  His other brother was lost at sea about five years ago, so Mr. Gomez Zuniga had been the sole support for many in his family.  His wife has diabetes, which is not controlled due a lack of access to healthcare, and she does not work outside the home.  After his arrest in this case, his sister who had a clerical job, was supporting his

3

wife and children. Unfortunately, his sister passed away in April from a heart attack. Mr. Gomez Zuniga's wife took in his sister's seven-year-old son after her death, but without his sister's financial support, the family is really struggling. A friend is supplying the family with fish when possible, so they at least have food.

Now, months later, Mr. Gomez Zuniga stands before the Court to accept his punishment. When Mr. Gomez Zuniga got that notice from the school, he thought to himself that his life could not get any worse. He was sadly wrong.

## II.     18 U.S.C. § 3553(a) FACTORS

### 1.     *The Nature and Circumstances of the Offense, Section 3553(a)(1)*

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (citing *Koon v. United States*, 518 U.S. 81, 113, 116 (1996)). As is the case with nearly every federal offense, the nature and circumstances of Mr. Gomez Zuniga's offense are serious. And, at the time he agreed to take the trip, he did not fully appreciate the seriousness. His primary concern was keeping his daughter in school so she could have a better life than his. From Mr. Gomez Zuniga's perspective, he thought he had no other choice. That type of rationalization is easier to accept in one's mind at a time of desperation. Poverty destroys people every day through confrontations with the law, disease, pollution, violence, and despair. His decision was neither wise nor commendable, but the judgments of desperate people are often regrettable. Under Section 3553(a) a sentencing court may properly consider a defendant's motive in mitigation of the sentence. *United States v. Ranum*, 2005 WL 161223, *5 (E.D.Wis. 2005) (citing *Wisconsin v. Mitchell,* 508 U.S. 476, 485 (1993)).

## 2. *The History and Characteristics of the Defendant, Section 3553(a)(1)*

"[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000). And, as the Supreme Court recently reiterated, "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted). Mr. Gomez Zuniga has not had an easy life. From the time when most children are just starting school, he labored as a fisherman to help feed his family. He never had the opportunity for education or a life better than a poor fisherman. Then, when his family's struggles reached the point where he could not even afford the clothes necessary for his children to attend school, he reached a breaking point. He is the type of person that would do anything for his children, and he took the only job that offered to alleviate his financial distress; one that will cost him way more than he ever hoped to earn.

But, to his credit, he took responsibility for his offense, cooperated with the Government, and the Government filed a motion recognizing his substantial assistance. (doc. 96). His willingness to help a foreign law enforcement agency is more indicative of his personal character than the offense he committed.

## 3. *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Section 3553(a)(2)(A)*

Although Mr. Gomez Zuniga has little knowledge of the United States legal system nor any allegiance to this country, he has always been respectful of the process, respectful and courteous to his attorney and the agents with whom he met, and has been a model inmate. He has not displayed any characteristics evincing a threat to the public outside of his conduct in this case or shown that he is beyond rehabilitation. *See, e.g., United States v. Sayad*, 589 F.3d 1110, 1118-

1119 (10th Cir. 2009) (finding downward variance reasonable where defendant was "good candidate for rehabilitation" based on defendant's recognition of seriousness of offense, strong family support, letters from the community, and lack of drug or sociopathic problems).

      Mr. Gomez Zuniga gave the government the only thing he had to offer to compensate for his offense: his cooperation. While his limited role in this offense does not leave him with as much information as some others may possess, his cooperation will hopefully help law enforcement further erode drug trafficking and make up for his participation in a drug offense. He recognizes that he had less information to provide the Government than others because he was such a minor figure in the conspiracy. No matter the usefulness of his information, he has taken substantial ameliorative actions including cooperation for which he bears the threat of violent retaliation. Mr. Gomez Zuniga's cooperation is a relevant factor in weighing the nature and circumstances of the offense and the history and characteristics of the defendant to arrive at a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *United States v. Huerta,* 878 F.2d 89, 93 (2d Cir. 1989) (citing 18 U.S.C. § 3553).

      Mr. Gomez Zuniga is frightened about what the future holds, and he is heartbroken that he left his family to subsist without his help. A just punishment in this situation must take into account that Mr. Gomez Zuniga has also been punished in ways other than the traditional prison sentence. He will be incarcerated in a foreign country where he knows no one. He has no money to make phone calls or to afford basic commissary items. He must rely on fellow inmates who are willing to share money for a phone call or some toiletries with him. His family will likely never visit him during his incarceration because they lack the means to travel to the United States. He has essentially been cut off from his family and friends. And, when he is eventually released, he has no assurances that his family will be waiting for him.

In addition to his isolation in the United States, Mr. Gomez Zuniga's imprisonment will be more punitive than expected due to COVID-19. For the foreseeable future, he will spend his imprisonment in lockdown conditions similar to solitary confinement. Since March 13, 2020, the Bureau of Prisons "modified its operations" to respond to the spread of COVID-19.[2] Individuals "in every institution" are "secured in their assigned cells/quarters to decrease the spread of the virus."[3] Programming, absent select UNICOR operations, has ceased and movement throughout the facilities was suspended.[4] Showers are limited to three times a week and telephone and email access, commissary, and laundry have been curtailed. Limiting access to showers and other personal hygiene basics may be helpful in reducing movement in the facility but also increases the occurrence of the virus on hands and other body parts. Unfortunately, CDC guidance on social distancing is unfeasible in a prison setting.[5] Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep near each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings. *See Wilson v. Williams*, --- F.Supp.3d ---, 2020 WL 1940882, at *3 (N.D. Ohio Apr. 20, 2020) (acknowledging that soap

---

[2] Fed. Bureau of Prisons, Fed. Bureau of Prisons COVID-19 Action Plan (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII.

[3] Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase VII).

[4] Fed. Bureau of Prisons, BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 28, 2020).

[5] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); see also Ctrs. for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

and disinfectant "can only be so useful in an environment where the inmates are constantly in close proximity to one another. Likewise, the education about hygiene and social distancing [BOP] tout[s] is only effective if the inmates have the supplies and physical space to put such knowledge into practice."). Not surprisingly, COVID-19 has had a severe impact on the Burau of Prisons and it is having a difficult time containing the spread.[6]

Mr. Gomez Zuniga's high blood pressure also puts him at greater risk of contracting COVID-19,[7] and puts him at a greater risk of death from COVID-19.[8] These more punitive and restrictive imprisonment conditions, the suspension of vocational and educational opportunities, and the increased exposure to a potentially fatal virus are the current realities of the sentence Mr. Gomez Zuniga will serve and are important considerations in determining the "just punishment for the offense." *See e.g., United States v. Smith*, 27 F.3d 649, 655-656 (D.C. Cir. 1994)(a downward departure may be appropriate where a defendant's status causes a fortuitous increase in the severity of his sentence.).

"[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007). However, "[t]here is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that

---

[6] Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP NEWS (Apr. 29, 2020), https://bit.ly/2AiMjrF.

[7] Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020. MMWR Morb Mortal Wkly Rep 2020;69:382–386. DOI: http://dx.doi.org/10.15585/mmwr.mm6913e2.

[8] Shi S, Qin M, Shen B, et al., *Association of cardiac injury with mortality in hospitalized patients with COVID-19 in Wuhan, China.* JAMA CARDIOL (March 25, 2020); *see also* Guo T, Fan Y, Chen M, et al. *Cardiovascular implications of fatal outcomes of patients with coronavirus disease 2019 (COVID-19).* JAMA CARDIOL (March 27th, 2020).

respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist." *United States v. Stern*, 590 F.Supp.2d 945, 957 (N.D. Ohio 2008).  Although he wanted to help his family, Mr. Gomez Zuniga is aggrieved by knowing his transgression put his family in a worse position than before his offense.  Now, they have even lost the meager support he provided.  The Bureau of Prisons will provide Mr. Gomez Zuniga with a roof, a bed, and food.  Unfortunately, Mr. Gomez Zuniga's family will bear the burden of his incarceration as they slip deeper into poverty.  *See United States v. Jebara*, 313 F.Supp.2d 912, 917 (E.D.Wis. 2004) (departure warranted to avoid "needless suffering" of family).  The punishment Mr. Gomez Zuniga will bear is greater than simply being confined to a cell.  He will miss his children growing up and the life he knew before his imprisonment will not be there when he is released.  Although the sentence he is requesting is less than the Presentence Report's current Sentencing Guidelines recommendation, it is no less just.

> 4. *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct, Section 3553(a)(2)(B) and the Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant, Section 3553(a)(2)(C)*

While it is impossible to divine at what threshold a particular sentence will have a deterrent effect on Mr. Gomez Zuniga and the community at large, a sentence of 33 months will not have any less deterrence than a sentence of 57 months or more.  An outsider viewing Mr. Gomez Zuniga's situation would not conclude he escaped penalty or that his life has not been substantially impacted by imprisonment in a foreign country, particularly when his substantial assistance is taken into account.  Certainty of punishment is a much better deterrent than severity. *See* Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011) (deterrence is achieved with certainty of punishment, not its severity); *see also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100

J. Crim. L. & Criminology 765, 817 (2010)([I]in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity).

While the Government's interest in discouraging people like Mr. Gomez Zuniga from participating in narcotics transportation is strong, that factor alone should not justify a lengthier sentence.  "It is true that almost any factor, considered in isolation, may be made to appear positive or negative, when employed by a talented rhetorician. But that is ignoring the context, the totality of the circumstances…the individual case and the individual defendant before it.  "*United States v. Roberson*, 573 F.Supp.2d 1040, 1050 (N.D.Ill. 2008)); *cf. also United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008)("[T]he Government's argument based on deterrence alone is flawed because it elevates one § 3553(a) factor—deterrence—above all others.").  "Individual criminal sentences are not the proper forum for an expansive dialogue about the principles of criminal justice. Such conversation, though vital, should not take place here—lives are altered each and every time a district court issues a sentence: this is not a theoretical exercise." *Stern*, 590 F.Supp.2d at 961.

A sentence of 33 months is a significant deterrent.  Mr. Gomez Zuniga has never been to prison, so it is an eternity to him.  At some point, the cost on U.S. taxpayers to incarcerate Mr. Gomez Zuniga outweighs the necessity of a greater punishment.

While prison does indeed prevent crime while people are locked up, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing.  COMMUNITY CORRECTIONS COLLABORATIVE NETWORK, MYTHS & FACTS: WHY INCARCERATION IS NOT THE BEST WAY TO KEEP COMMUNITIES SAFE 10 (2016).  Lengthy imprisonment without some offender specific reason not only burdens government budgets, but also fails to enhance public safety.  VALERIE WRIGHT, *Deterrence in Criminal Justice: Evaluating*

*Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, November 2010, at 9. Yet, the longer Mr. Gomez Zuniga's sentence, the more life will pass him by, he will become institutionalized, and his transition back to society will be more difficult. *See, e.g., United States v. Hawkins,* 380 F.Supp.2d 143, 165 (E.D.N.Y. 2005), *aff'd,* 228 Fed.Appx. 107 (2d Cir. 2007) (concluding that incarceration "will in effect doom her.... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.").

When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Lin Song and Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served*, OLYMPIA, WA: WASHINGTON STATE INSTITUTE OF PUBLIC POLICY (1993). Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism. Thomas Orsagh and Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, JOURNAL OF QUANTITATIVE CRIMINOLOGY, 4(2):155-171, 1988. There is not a significant benefit to deterrence by increasing the severity of sentences by imposing longer prison terms. *See* Wright, *supra* at 9. Rather, research shows that increasingly lengthy prison terms are counterproductive. *Id*.

Mr. Gomez Zuniga committed this offense because he is poor and additional prison time will not solve that problem. Educational and vocational support will go much further in keeping Mr. Gomez Zuniga from reoffending.

> 5. *<u>The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner, Section 3553(a)(2)(D)</u>*

While Mr. Gomez Zuniga would greatly benefit from educational and work opportunities, and he intends to take advantage of programs offered at his prison facility, such rehabilitation can be accomplished in 33 months. Mr. Gomez Zuniga finds himself in this situation because he did not have the education or skills to earn enough money to support his family. Learning to read and write, learning English, and adding job skills such as mechanics or electrical would help Mr. Gomez Zuniga support his family and keep him from turning to crime for employment. Although prison may offer Mr. Gomez Zuniga opportunities to improve himself, he will likely be able to achieve that during a sentence of 33 months. A longer sentence will only deteriorate his ability to transition back to society.

Mr. Gomez Zuniga badly wants to work during his incarceration so he can send money to his family. Not all prison facilities offer work opportunities, and some give preference to U.S. citizens for open jobs. Mr. Gomez Zuniga respectfully requests the Court recommend a facility where he would have work opportunities such as Ft. Dix.

**III.     THE SENTENCING GUIDELINES, SECTION 3553(a)(4)**

    A. *<u>Minor Role</u>*

Mr. Gomez Zuniga requests the Court impose a downward departure for minor role pursuant to USSG § 3B1.2. Pursuant to *United States v. Cruickshank*, 837 F.3d 1182 (11th Cir. 2016), a defendant in Mr. Gomez Zuniga's position is eligible for a role adjustment. The recent clarification to USSG § 3B1.2 provides that "[f]or example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." U.S.S.G. Supp. App. C, Amend.

794. And, as Application Note 3(A) to USSG § 3B1.2 states: "For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored, may receive an adjustment under this guideline." Those examples encapsulate Mr. Gomez Zuniga's role in this offense.

Mr. Gomez Zuniga's participation in the offense satisfies nearly all of the non-exhaustive list of factors found in Application Note 3(C) of § 3B1.2.[9] Mr. Gomez Zuniga had little understanding of the scope and structure of the criminal activity. He only knew enough to allow him to perform the specific tasks he was directed to perform. He did not recruit anyone to join the activity and was himself recruited by someone else. He was not responsible for obtaining the drugs, nor was he aware of where they came from, who owned them, the amount, or their ultimate destination. He had no idea how these drugs were to reach the United States or how they would be distributed. To this day he would not know the quantity of drugs without reviewing the discovery provided by the Government. He did not obtain the boat, choose the course, or prepare the boat for the journey. He had no involvement in planning or organizing even the most basic activities associated with the activity. He had no decision-making authority or influence over any other person. In fact, if he had deviated in any way from the instructions given to him, he likely

---

[9] The non-exhaustive list of factors are:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

would have been harmed. In his role as a mariner, he had no discretion over how the drugs were to be transported, the route, the individuals he would work with, or any other details associated with moving something from one location to another. His only responsibility was to perform whatever tasks were directed by the captain to keep the vessel going. He was to be paid a set amount for being a crew member on the boat and had no proprietary interest in the purchase or sale of any of the drugs.

Like *Cruickshank*, while the amount of drugs in this case is considerable (although less than *Cruickshank*), "there is nothing in the record to suggest that the amount of drugs was indicative of the magnitude of [the defendant's] participation in the crime -- to the contrary, he did not load the drugs on the vessel, reconstruct the vessel, fuel the vessel, attend the planning meetings for the trip, or otherwise appear to have any role concerning the quantity of drugs." *Cruickshank*, 837 F.3d at 1195 n. 1. The amount of drugs involved in this case was not something over which Mr. Gomez Zuniga had any control and does not distinguish this case from *Cruickshank*. "This is a fact-intensive inquiry where no one factor is more important than another." *United States v. Valencia,* -- F.3d. --, 2020 WL 4332376, at *5 (11th Cir. July 28, 2020) (citations omitted).

Mr. Gomez Zuniga's role is even less than the typical crew member as he was a late addition to the crew because his friend simply wanted to help him out with his financial situation. He was not necessary to the voyage as they had originally planned to just have three crew members. Even if Mr. Gomez Zuniga's role could be considered important to the success of the venture, such a factor is not determinative. U.S.S.G. Supp. App. C, Amend. 794. Nearly every job associated with a criminal enterprise, or even a legitimate enterprise, could be considered important to some aspect of the enterprise, otherwise the job would not exist. People above Mr. Gomez Zuniga organized and funded this voyage, obtained the drugs and the boat, mapped the course, loaded the

14

boat, determined a launching and docking spot, and recruited the people to fill the multiple jobs required to accomplish the voyage. Mr. Gomez Zuniga played his part, but it was a small part in comparison. *See United States v. Perez*, 321 F.Supp.2d 574, 585-586 (S.D.N.Y. 2004) (salaried employee of drug enterprise who participated in conspiracy for extended time, had considerable knowledge of scope of conspiracy, and worked directly for the leader of the enterprise entitled to minor role reduction where leader had ownership interest in the drugs, profited from the drugs, and made the decisions).

If the Court does not find Mr. Gomez Zuniga qualifies for a departure under the rigid framework of the guidelines, Mr. Gomez Zuniga asks the Court to consider his lesser role in conjunction with other mitigating factors and grant him a variance from his guidelines sentence as discussed below. "[A]fter *Booker,* a district judge can fairly consider policy statements concerning departures and fairly decide to impose a non-Guidelines sentence without definitively resolving close questions regarding the precise meaning or application of a departure policy statement." *United States v. Canova*, 412 F.3d 331, 358 n. 28 (2d Cir. 2005).

### B. USSG § 5K1.1, Substantial Assistance

At the time of sentencing, Mr. Gomez Zuniga requests the Court consider at least one level of departure in addition to the two levels recommended by the Government in its 5K1.1 motion (doc. 96) for a total of three or more levels for substantial assistance. Although Mr. Gomez Zuniga may not have a treasure chest of information given his limited role in the offense, he nonetheless cooperated at considerable personal risk. Mr. Gomez Zuniga knows little of the United States but was willing put aside his distrust of law enforcement in his own country and fear of retribution to help our government. His courage should be rewarded.

## IV. REQUEST FOR VARIANCE

As the Court is free to sentence Mr. Gomez Zuniga without regard to whether he meets the technical requirements of any Guidelines departures, due to his significant mitigating circumstances, he requests a sentence of 33 months, the low end of an offense level 21 on the sentencing table. Following *Gall v. United States,* there is no requirement of "'extraordinary' circumstances to justify a sentence outside the Guidelines range." 552 U.S. 38, 47 (2007). Subject to review for reasonableness, district judges are now free to apply their own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the guidelines. *United States v. Rodriguez*, 406 F.3d 1261, 1289 (11th Cir. 2005) (Tjoflat, J., dissenting) (citing *Booker*, 125 S.Ct. at 790 (Scalia, J., dissenting)).

Mr. Gomez Zuniga is an exceedingly poor person. By U.S. standards, he would be amongst the poorest people in the country. Even by Colombian standards, he is impoverished. And, he made a bad decision in the face of desperate financial circumstances. He deserves to be punished, but he also deserves some measure of mercy.

In order for the cocaine on Mr. Gomez Zuniga's vessel to reach the United States, there were dozens of people involved in that process from the people who owned it, to the people who got it to the coast, to the people who would take the cocaine from Mr. Gomez Zuniga's boat and transport it through Central America and Mexico. If all of those people were now standing before the Court, Mr. Gomez Zuniga would be amongst the least culpable, if not the least culpable. He is simply the one who has been caught.

Mr. Gomez Zuniga did not own these drugs and stood to gain only the agreed upon payment (about $500) to make this trip. A payment he desperately needed to support his family. It was

wrong, but people in his position will continue to make this mistake as long as they have to choose between committing a crime or letting their families suffer in poverty.

With the First Step Act's extension of safety valve to these maritime cases, the sentences for crew members have become less standardized. For example, in case no. 8:18-cr-510-T-35JSS, a group of three mariners received sentences of 46, 46, and 51 months imprisonment respectively. (doc. 67, 79, 85). The sentence Mr. Gomez Zuniga requests is not substantially less than these sentences and his case involves a lower drug weight and substantial assistance.

To date, life has not been particularly lenient to Mr. Gomez Zuniga from growing up as a penniless fisherman to his present impoverished circumstances. Mr. Gomez Zuniga asks the Court to show leniency on him and sentence him to 33 months imprisonment. If a person's "immediate misconduct" should ever be "assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006). Such a sentence is sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553(a) criteria and to accomplish the goals of sentencing.

Respectfully submitted,

By: /s/ *P. Matthew Luka*
P. MATTHEW LUKA
Florida Bar No.  0555630
TROMBLEY & HANES. P.A.
707 North Franklin Street
10th Floor
Tampa, Florida  33602
Telephone: (813) 229-7918
Facsimile:  (813) 223-5204
mluka@trombleyhaneslaw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 20, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                               /s/ *P. Matthew Luka*
                                               P. MATTHEW LUKA